FILED

06/26/2018

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 27, 2018 Session

**STATE OF TENNESSEE v. NEHAD SOBHI ABDELNABI**

**Appeal from the Criminal Court for Knox County**
**No. 100273A   Steven Wayne Sword, Judge**

_____

**No. E2017-00237-CCA-R3-CD**
_____

The Knox County Grand Jury indicted the Defendant, Nehad Sobhi Abdelnabi, on two counts of especially aggravated kidnapping, two counts of aggravated assault, and one count of aggravated burglary. The Defendant's first trial resulted in a mistrial. At the Defendant's second trial, the jury convicted him of aggravated kidnapping in count one, especially aggravated kidnapping in count two, and aggravated assault in counts three and four. The jury acquitted the Defendant of aggravated burglary in count five. The trial court sentenced the Defendant to serve twelve years for count one, seventeen years for count two, and six years for counts three and four, respectively. The trial court merged the Defendant's conviction in count one into count two and merged count four into count three and ordered that he serve the sentences concurrently, for a total effective sentence of seventeen years in the Tennessee Department of Correction (TDOC) at 100% release eligibility. On appeal, the Defendant argues the following: (1) the trial court erred in denying the Defendant's motion to dismiss the indictment because the State violated the rule against double jeopardy by intentionally eliciting objectionable testimony from a State witness in the Defendant's first trial; (2) the trial court erred by denying the Defendant's motion for mistrial when the victim told the Defendant to "[b]e a man" and "[t]ake the stand" during the victim's cross-examination; (3) the State committed prosecutorial misconduct by allowing the victim's objectionable testimony, which violated the Defendant's right to not testify; (4) the victim's objectionable testimony and "the subsequent denial of the motion for mistrial[] violated his constitutional right to a fair trial"; (5) the trial court erred by limiting the Defendant's cross-examination of the co-defendant, Lowi Akila, which violated the Defendant's right to confrontation; (6) the trial court erred by excluding testimony regarding the victim's alleged bias; (7) the trial court erred under Tennessee Rule of Evidence 604 and Tennessee Supreme Court Rule 42 in denying the Defendant's request to require witnesses to testify in the language that the testimony was originally given in; (8) the trial court violated the Defendant's right to due process by allowing witnesses to testify in English about conversations that occurred in Arabic; (9) the trial court erred by admitting the victim's medical records; (10) the

State violated *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to disclose that the victim received compensation from the State of Tennessee; (11) the evidence was insufficient for a rational juror to have found the Defendant guilty of aggravated kidnapping, especially aggravated kidnapping, and aggravated assault beyond a reasonable doubt; (12) the trial court erred in its application of enhancement factors to the Defendant's sentence; (13) the Defendant's sentence contravenes the principles and purposes of the Tennessee Sentencing Act; and (14) the Defendant is entitled to cumulative error relief. After a thorough review of the facts and applicable case law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J. ROSS DYER, JJ., joined.

Robert L. Jolley, Jr., and Megan A. Swain, Knoxville, Tennessee, for the appellant, Nehad Sobhi Abdelnabi.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Charme Allen, District Attorney General; and Kevin Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Factual and Procedural History**

This case arises from the kidnapping and assault of the victim, Naser Ferwanah, by the Defendant and co-defendant, Lowi Fathi Akila, on February 1, 2012. On September 18, 2012, the Knox County Grand Jury indicted the Defendant on two counts of especially aggravated kidnapping, two counts of aggravated assault, and one count of aggravated burglary. The Defendant's case proceeded to trial in November 2015. The trial court granted the Defendant's motion for mistrial after Mr. Akila referred to a previous incident where the Defendant allegedly threatened another man with a gun.

*The State's Proof*

At the Defendant's second trial, Michael Mays testified that he worked for the Knox County Emergency Communications District as the keeper of the records. He stated that someone called 911 on February 2, 2012, around 1:56 a.m. from a residence on Halifax Road regarding an assault.

Naser Ferwanah testified that he was born in Palestine and immigrated to the United States in 1992. Mr. Ferwanah visited the Defendant in Knoxville in 1992 but did not move to Knoxville until 2005. Mr. Ferwanah went to high school in Palestine with the Defendant. Prior to moving to Knoxville, Mr. Ferwanah owned a business that was in financial trouble, and the Defendant lent him $13,000 to help the business. Mr. Ferwanah had visited with the Defendant and his family in the past, but he had never been alone with the Defendant's wife. Mr. Ferwanah also visited the Defendant at his business, Electronics Tech, about once a month. In December 2011, the Defendant called Mr. Ferwanah and asked if they could meet. Mr. Ferwanah agreed to meet the Defendant after he recovered from an illness. On January 3, Mr. Ferwanah drove to Electronics Tech to speak with the Defendant. The Defendant commented that Mr. Ferwanah looked sick and asked to see Mr. Ferwanah's skin. The Defendant said that he would talk with Mr. Ferwanah later because Mr. Ferwanah was still feeling ill.

A few days later, the Defendant called Mr. Ferwanah and asked to stop by Mr. Ferwanah's house to speak with him. Mr. Ferwanah stated that the Defendant appeared nervous, but his behavior was not otherwise unusual. Mr. Ferwanah invited the Defendant to come into his house and sit down. The Defendant asked Mr. Ferwanah to go get his Quran and his oldest son, who was at school. Mr. Ferwanah explained that, in his community, individuals would swear on the Quran in the presence of their oldest son to tell the truth. Mr. Ferwanah obtained his Quran, and the Defendant asked him if he had a "relationship" with the Defendant's wife. Mr. Ferwanah explained that the Defendant was referring to an extramarital affair. Mr. Ferwanah swore on his Quran that he was not having an affair with the Defendant's wife. Mr. Ferwanah asked the Defendant why he believed that Mr. Ferwanah was having an affair with his wife, and the Defendant stated that the description of the individuals in a video[1] fit his wife and Mr. Ferwanah.

Later that day, Mr. Ferwanah picked his children up from school and took his oldest son to Electronics Tech to again swear that he was not having an affair with the Defendant's wife. The Defendant told Mr. Ferwanah that he believed Mr. Ferwanah. The Defendant mentioned a video that showed his wife having sex with another man from the neck down. The Defendant explained that he had a friend who was a former FBI agent who was analyzing the video for the Defendant to determine the identity of the man. The Defendant asked Mr. Ferwanah to pull up his shirt so the Defendant could take a photograph of Mr. Ferwanah's chest to compare to the video. Mr. Ferwanah complied.

---

[1] As explained later in this opinion, the Defendant believed that a pornographic video on the internet depicted his wife and Mr. Ferwanah engaging in sexual intercourse.

A few days after the Defendant took a photograph of Mr. Ferwanah's chest, Mr. Ferwanah called the Defendant and asked who told the Defendant about the video that allegedly depicted the Defendant's wife. The Defendant told Mr. Ferwanah not to worry about it and invited Mr. Ferwanah to go to dinner with him and one of his employees, Lowi Akila. Mr. Ferwanah knew Mr. Akila from high school in Palestine, but he was not friends with Mr. Akila. Neither the Defendant nor Mr. Ferwanah brought up the video at dinner. After they finished eating, the Defendant suggested that the three men meet for dinner every week. On January 31, 2012, the Defendant asked to come over to Mr. Ferwanah's residence. When the Defendant arrived, he asked to see Mr. Ferwanah's bedroom because he was remodeling his own residence. The Defendant also asked to see Mr. Ferwanah's attic. While Mr. Ferwanah was in his attic, he accidentally stepped through the drywall; the Defendant agreed to send someone to Mr. Ferwanah's residence the next day to repair the drywall. The Defendant stopped by Mr. Ferwanah's house the next day, February 1, to check on the drywall repair. Mr. Ferwanah stated that the Defendant appeared nervous. The Defendant asked Mr. Ferwanah to have dinner with him after the repair was complete.

Mr. Ferwanah drove to Electronics Tech that evening between 6:30 and 7:00 p.m. and stayed in his vehicle while he waited for the Defendant and Mr. Akila to come out of the business. However, the Defendant waved at Mr. Ferwanah to come into the store. The Defendant stated that he wanted to show Mr. Ferwanah how someone can get untied if they are tied up. Inside Electronics Tech, the Defendant asked Mr. Ferwanah and Mr. Akila to sit in wooden chairs in the office area. The Defendant locked the door, tied Mr. Akila's hands to the chair arms, and put duct tape around Mr. Akila's chest. The Defendant then tied Mr. Ferwanah's hand to the chair arms and taped Mr. Ferwanah's chest and legs to the chair. The Defendant untied Mr. Akila and said, "Let's go." A masked man[2] came into the room from the garage door. The masked man and the Defendant lifted Mr. Ferwanah's chair, walked to the garage, and threw Mr. Ferwanah onto the concrete floor. Mr. Akila was behind Mr. Ferwanah, so Mr. Ferwanah was unsure if Mr. Akila also helped carry the chair. Mr. Ferwanah's chair broke, but his hands and legs were still tied to the chair pieces. The masked man tied Mr. Ferwanah's hands behind his back with a zip tie, and the Defendant began hitting Mr. Ferwanah with a baseball bat and kicking him. The masked man hit Mr. Ferwanah with a "two-by-four." The Defendant informed Mr. Ferwanah that he had "guys waiting outside" that were going to take Mr. Ferwanah and throw him into the Tennessee River to drown. Mr. Ferwanah was screaming and asking the Defendant to let him go. The Defendant told Mr. Ferwanah that he would let Mr. Ferwanah go if Mr. Ferwanah gave him the tapes. Mr. Ferwanah told the Defendant that he did not have any tapes, and the Defendant

---

[2] Mr. Ferwanah testified that the Defendant called this man "Sam."

continued kicking Mr. Ferwanah. Mr. Ferwanah stated that the Defendant also had a gun and a knife on a table.

Mr. Ferwanah testified that, during the assault, Mr. Akila held a camera. After the Defendant assaulted Mr. Ferwanah, the Defendant and Mr. Akila went back into the office area. Mr. Akila returned to the garage area and told Mr. Ferwanah that the Defendant would let him go if he gave the Defendant the tapes. The Defendant then returned to the garage and continued assaulting Mr. Ferwanah. Mr. Akila and the Defendant continued alternating between assaulting Mr. Ferwanah and asking for the tapes. At one point, the Defendant opened and closed the gun to show Mr. Ferwanah that it was loaded and pointed it at Mr. Ferwanah's head. The Defendant also wanted Mr. Ferwanah to watch a video that allegedly showed the Defendant's wife, but Mr. Ferwanah refused to watch the video. When Mr. Ferwanah was unable to remain on his knees, Mr. Akila untied him. The assault lasted between two and three hours. The Defendant and Mr. Akila dragged Mr. Ferwanah to a table in the garage and asked Mr. Ferwanah for his passwords to various accounts on the internet. The masked man pointed the gun at Mr. Ferwanah's head and told Mr. Ferwanah that he would kill Mr. Ferwanah's wife and children if Mr. Ferwanah told the police about the offenses.

The Defendant and Mr. Akila carried Mr. Ferwanah to a bathroom, washed the blood off of Mr. Ferwanah, and put him in the passenger seat of his vehicle. The Defendant got into the driver's seat of Mr. Ferwanah's vehicle and asked if Mr. Ferwanah had health insurance. When Mr. Ferwanah stated that he had health insurance, the Defendant offered to take Mr. Ferwanah to a hospital if Mr. Ferwanah came up with an explanation for his injuries. However, Mr. Ferwanah asked the Defendant to drive him to his residence instead. When Mr. Ferwanah and the Defendant arrived at Mr. Ferwanah's residence, the Defendant helped Mr. Ferwanah inside, gave him a bath, changed his clothes, and put him into bed. The Defendant told Mr. Ferwanah's wife that Mr. Ferwanah had been in an accident. After the Defendant left, Mr. Ferwanah told his wife that the Defendant had assaulted him and was going to kill his family. Mr. Ferwanah fell asleep or was unconscious for several hours after the Defendant left. His wife woke him up, and he called 911. An ambulance took Mr. Ferwanah to Parkwest Hospital, and he was later transferred to the trauma center at the University of Tennessee Medical Center. Mr. Ferwanah sustained fractures in his left ankle, right wrist, and left wrist and bruising and lacerations on various places on his body. He also sustained an injury to his head. Mr. Ferwanah testified that his pain level after the offenses was ten out of ten, and his pain did not lessen until he was given morphine at the hospital. He stated that he could not return to work for four and a half months. Mr. Ferwanah still had pain in his right shoulder, and he occasionally "mixed up" words due to his head injury. Mr. Ferwanah testified that he filed a civil suit against the Defendant, Electronics Tech, Mr. Akila, and

"John Doe" after the offenses. However, he did not know the current status of his civil case.

On cross-examination, Mr. Ferwanah explained that he believed the Defendant had jokingly tied him up until the Defendant and the masked man threw Mr. Ferwanah onto the concrete floor of the garage while tied to the chair. Mr. Ferwanah agreed that, when he was discharged from the University of Tennessee trauma center, he received a prescription for Tylenol 3 and Percocet. Mr. Ferwanah also agreed that he requested $15,500,000 in damages in his civil suit. He explained that he informed his attorneys of the details of the offenses and that the attorneys decided on the amount to request in damages. Mr. Ferwanah was aware that Mr. Akila was originally charged with a Class A felony but pled guilty to accessory after the fact, a Class E felony, in exchange for a sentence of two years.

Fatma Sekik testified that she had been married to the Defendant for twenty years. She explained that she and the Defendant were obtaining a divorce. Ms. Sekik stated that, approximately six weeks prior to the current offenses, the Defendant accused her of having an affair. The Defendant showed her a video of two individuals having sex and claimed that the woman in the video was her. Ms. Sekik denied that she was in the video. The Defendant repeated his accusation for several days. The Defendant told Ms. Sekik that he was going to have an expert enhance the video so that he could determine whether she was in the video. Ms. Sekik identified Mr. Ferwanah as her husband's friend and stated that she had never been alone with or had an affair with Mr. Ferwanah.

Officer Russell Whitfield testified that he worked in the forensic unit of the Knoxville Police Department ("KPD"). On February 2, 2012, Officer Whitfield responded to a report of an assault at Electronics Tech. He met with the officers who were already at the scene and took photographs of the building. Officer Whitfield noticed that the garage area of the building was very clean, and he could smell cleaner.

Beth Goodman testified that she formerly worked as an evidence technician with the KPD. In February 2012, Ms. Goodman assisted in investigating Mr. Ferwanah's kidnapping and assault. She documented, photographed, and recovered items from a dumpster at an apartment complex in west Knoxville. Those items included a blue blanket, a large plastic sheet, and pieces of a broken chair.

Darren James Luna testified that he formerly worked at Electronics Tech for approximately eight years. Mr. Luna described February 1, 2012, as a normal work day at Electronics Tech. He explained that he mainly worked in the garage area of the business and that he left between 6:00 and 6:30 p.m. Mr. Luna stated that, on February 2, 2012, the Defendant did not come to Electronics Tech, which was "somewhat" unusual.

Mr. Luna noticed "the strong smell of bleach" when he walked into the building. He also observed that "the floor was really clean" like it had just been mopped. Mr. Luna saw a bucket with bloody blankets and noticed that his tools had blood on them. He also saw "a bat or stick or something with some blood on it." Mr. Luna cleaned the blood off of his tools and explained that it "was unusual, but it wasn't unusual" to see blood in the garage area.

On cross-examination, Mr. Luna stated that, when he left Electronics Tech on February 1, the Defendant and Mr. Akila were at the business. Mr. Luna saw Mr. Ferwanah at Electronics Tech "every once in a while." He stated that the elevator that went from the office area to the garage area was large enough to fit a chair. He explained that the garage door was opened by a button on the wall of the garage and a remote that typically stayed inside the garage.

Lowi Fathi Akila testified that he was charged as a co-defendant in the indictment in the Defendant's case. He stated that, in exchange for testifying truthfully in the Defendant's case, he would plead guilty and that his conviction would be diverted after the service of two years' probation. Mr. Akila explained that he was distantly related to the Defendant and that he grew up with the Defendant and Mr. Ferwanah in Palestine. Mr. Akila immigrated to the United States in 1984 and lived in Knoxville. He explained that, in 2011, a female dancer and singer had an affair with a businessman in Egypt; this affair was discussed in the news in the Middle East. Mr. Akila found a video of the dancer and the businessman on a website and showed it to the Defendant. In February 2012, Mr. Akila worked at Electronics Tech with the Defendant and Wheels Auto Sales. Mr. Akila occasionally saw Mr. Ferwanah at Electronics Tech. Approximately three or four months prior to the offenses, the Defendant wanted to show Mr. Akila a video that he had found on the internet that he believed showed his wife cheating on him. The Defendant showed Mr. Akila the video and continued to discuss the video with Mr. Akila "almost every day." Mr. Akila stated the following about his interaction with the Defendant about the video:

> He just simply sa[id], ["]I found out she's cheating [on] me and I have the proof and I want to show you.["] And I told him that I can't believe that and there is no way. I know your wife. And he said, well, let me show you.
>
> So he played the videotape. And I simply left. And I said, you must be kidding me. By looking at this video, you can't even see the woman's face. And you accusing him -- or the guy's face and you saying that's your wife and Mr. Ferwanah. That is ridiculous. It does not make any sense to

me. I don't see any single thing that can -- tells me that it would be a possibility.

Mr. Akila stated that the Defendant "kept insinuating he[] [had] other help, other information to support his theory" that his wife was having an affair with Mr. Ferwanah. The Defendant told Mr. Akila that he had hired two former FBI agents who believed that the video depicted Mr. Ferwanah based on Mr. Ferwanah's voice and photographs. Mr. Akila saw the former FBI agents at Electronics Tech speaking with the Defendant. Mr. Akila also testified that the Defendant made an audio recording of himself and his wife to compare with the video that he found on the internet. Mr. Akila felt "very embarrassed and very ashamed" about the Defendant's actions. He described the Defendant as "always extremely nervous" and "always extremely on edge." When Mr. Akila expressed his belief that the woman in the video was not the Defendant's wife, the Defendant "look[ed] at [Mr. Akila] with his eyes blaring [and asked], [']H]ow do you know? You have never seen her body, or have you?[']" Mr. Akila told the Defendant that Mr. Ferwanah and the Defendant's wife were not the type of people who would have an affair. The Defendant later showed Mr. Akila a photograph of Mr. Ferwanah's chest that the Defendant compared to the internet video. The Defendant also asked Mr. Akila to regularly join him and Mr. Ferwanah for dinner.

On the day of the offenses, Mr. Akila worked at Wheels Auto Sales. The Defendant told Mr. Akila that he needed to come to Electronics Tech after he finished working at Wheels Auto Sales because the Defendant wanted to speak with Mr. Ferwanah about the video. The Defendant believed that Mr. Ferwanah would confess to the affair after the Defendant presented evidence of the affair to him. Mr. Akila informed the Defendant that he did not want to be involved, but the Defendant told Mr. Akila that he just wanted to talk with Mr. Ferwanah and that he wanted Mr. Akila to be a witness. Mr. Akila arrived at Electronics Tech around 5:50 p.m., collected his paycheck from the Defendant, drove to his bank, and deposited the check. When Mr. Akila returned to Electronics Tech, the other employees had left. Mr. Akila explained that the Defendant and Michael Corleon Desouzaneti[3] were at Electronics Tech, although Mr. Akila was initially unaware of Mr. Desouzaneti's presence in the business. The Defendant informed Mr. Akila that, when Mr. Ferwanah arrived, he wanted to speak with Mr. Ferwanah about the allegations and then the three men would go to dinner. Mr. Ferwanah pulled into the parking lot and called Mr. Akila, who told Mr. Ferwanah to come inside the building.

When Mr. Ferwanah entered, the Defendant said he wanted to show Mr. Akila and Mr. Ferwanah something interesting. Mr. Akila and Mr. Ferwanah sat in chairs, and the Defendant put duct tape around Mr. Akila. Mr. Akila explained that the Defendant did

---

[3] Mr. Akila identified Mr. Desouzaneti as the third person involved in the offenses.

- 8 -

not mention restraining him with duct tape prior to Mr. Ferwanah's arrival. After taping Mr. Akila, the Defendant also restrained Mr. Ferwanah with duct tape. The Defendant cut Mr. Akila's tape and "screamed" for Mr. Desouzaneti to "come over here." Mr. Desouzaneti came out of the office, and the Defendant and Mr. Desouzaneti carried Mr. Ferwanah into the garage. Mr. Ferwanah screamed for Mr. Akila, who was scared. Mr. Akila saw the Defendant and Mr. Desouzaneti throw Mr. Ferwanah onto the garage floor. Mr. Desouzaneti tied Mr. Ferwanah's hands and legs with zip ties, and the Defendant and Mr. Desouzaneti began hitting Mr. Ferwanah. Mr. Akila stated that the Defendant was hitting Mr. Ferwanah with a "baseball stick," and Mr. Desouzaneti was hitting Mr. Ferwanah with "a metal device for hitting people." Mr. Desouzaneti also had a gun in his belt, and he was kicking Mr. Ferwanah. The Defendant and Mr. Desouzaneti assaulted Mr. Ferwanah "[o]ff and on for . . . an hour and a half, two hours." The Defendant told Mr. Ferwanah that his wife had admitted to having an affair with Mr. Ferwanah and that the Defendant had already taken care of her. Mr. Akila told Mr. Ferwanah that he should confess if he knew anything, and Mr. Akila would get the Defendant to stop the assault. The Defendant also asked Mr. Ferwanah where he was hiding the original video recordings. The Defendant took Mr. Ferwanah's cell phone so that he could inspect Mr. Ferwanah's emails. The Defendant told Mr. Akila to go to the office and retrieve the Defendant's gun. When Mr. Akila brought the gun to the garage, the Defendant pointed it at Mr. Ferwanah's head. The Defendant told Mr. Ferwanah that, if Mr. Ferwanah did not tell the Defendant where the video recording was, the Defendant would shoot Mr. Ferwanah in the head and throw Mr. Ferwanah's body in the lake.

Mr. Akila stated that Mr. Ferwanah was bleeding from his head, legs, eyes, and mouth. Mr. Akila helped the Defendant clean up the garage area for business the next day. The Defendant told Mr. Akila to take the plastic tarp and towels that were on the garage floor and the broken chair that Mr. Ferwanah had sat in and put the items in the dumpster of a nearby apartment complex. Mr. Akila saw the Defendant pour bleach on the garage floor to clean it. Mr. Akila told the Defendant that Mr. Ferwanah needed to go to a hospital. As Mr. Akila helped Mr. Ferwanah get into a vehicle, he heard Mr. Ferwanah tell the Defendant that he did not want to go to the hospital because the hospital employees would ask Mr. Ferwanah how he became injured. The Defendant told Mr. Ferwanah that he was "man enough" to admit that he caused Mr. Ferwanah's injuries. Mr. Akila left Electronics Tech shortly after the Defendant left to take Mr. Ferwanah to the hospital.

On cross-examination, Mr. Akila stated that the Defendant asked him to photograph the assault on Mr. Ferwanah, but Mr. Akila did not turn the camera on. Mr. Akila agreed that he was currently on bond for his participation in the current offenses and that he was charged with especially aggravated kidnapping. Mr. Akila explained that he previously borrowed money from the Defendant, and he repaid the Defendant by

working for him. Mr. Akila stated that, before the Defendant cleaned the garage, the Defendant carried Mr. Ferwanah to a bathroom in the garage and washed the blood off of him. When the Defendant left with Mr. Ferwanah, Mr. Akila believed that they were going to a hospital. However, the Defendant later called Mr. Akila and asked Mr. Akila to pick him up from Mr. Ferwanah's residence.

### *The Defendant's Proof*

Joy Gensheimer testified that she had known the Defendant for approximately seven and one-half years. She held a good opinion of the Defendant's character. Dr. Adel Hussein testified that he had known the Defendant for more than twenty years. In his opinion, the Defendant had a good reputation. Tiki Dixon testified that he had known the Defendant for approximately sixteen years and that the Defendant had a reputation for having good character. Ramadan Damiri testified that he had known the Defendant for over twenty years and that the Defendant had a good reputation in the Islamic community of Knoxville.

The jury convicted the Defendant of aggravated kidnapping in count one, especially aggravated kidnapping in count two, aggravated assault in count three, and aggravated assault in count four. The jury acquitted the Defendant of aggravated burglary in count five.

### *Sentencing Hearing*

At the Defendant's sentencing hearing, the trial court noted that it had read the presentence report, which the trial court admitted as an exhibit at the State's request. Mr. Ferwanah gave a victim impact statement. He stated that he sustained a broken ankle, two broken wrists, bleeding in his head, and bruising from the Defendant's offenses. Mr. Ferwanah took unpaid leave from his job for five months to recover from the injuries he received during the Defendant's assault.

Ms. Gensheimer testified by reading a letter that she had previously written. She stated that the Defendant was "a very good citizen" and "a very hard-working man[.]" She described the Defendant as "an outstanding father." Ms. Gensheimer testified that the Defendant helped others financially when they were in need. Dr. Hussein testified that he had known the Defendant for more than twenty years. Dr. Hussein described the Defendant as a very helpful person who had good character. He stated that the Defendant was "very attached to his family." Mr. Damiri testified that he had known the Defendant for twenty years as a member of the Islamic community in Knoxville. He stated that the Defendant was "a very good person." Sharin Abdelnabi, the Defendant's oldest daughter, testified that the Defendant was her best friend and that life without him was

impossible. Nesma Abdelnabi, the Defendant's younger daughter, testified that she and her siblings looked up the Defendant. The Defendant made an allocution and stated that he was "extremely sorry[.]"

The trial court found that the Defendant was a Range I standard offender. The trial court found that the Defendant was not eligible for a probated sentence on counts one and two. The trial court found that the Defendant was a leader in the commission of the offense that involved one or more actors. The trial court stated that "[t]he facts clearly show that [the Defendant] organized this attack on Mr. Ferwanah and that everyone was following his directions. He not only set it up, but he was calling the shots throughout the entire thing, including the end of it[.]" The trial court gave this factor "a significant deal of weight[.]" The trial court also found that the Defendant treated or allowed Mr. Ferwanah to be treated with exceptional cruelty during the commission of the offenses. The trial court noted that Mr. Ferwanah felt terrified and helpless during the offenses and believed that he was going to die. The trial court stated that Mr. Ferwanah's kidnapping was "one of the worst" that the trial court had seen. However, the trial court did not give this enhancement factor much weight because treating the victim with exceptional cruelty was "subsumed in the elements of especially aggravated kidnapping and aggravated assault."[4] The trial court found that the Defendant possessed or employed a firearm or other deadly weapon during the commission of the offenses. The trial court applied this enhancement factor to counts two and three only and gave the factor "some weight."

Regarding mitigating factors, the trial court noted that the Defendant had no prior convictions. The trial court gave this factor "a good deal of weight[.]" The trial court found that the factor in Tennessee Code Annotated section 39-13-305(b)(2) and -304(b)(2), that "[i]f the offender voluntarily releases the victim alive or voluntarily provides information leading to the victim's safe release, such actions shall be considered by the court as a mitigating factor at the time of sentencing[,]" applied because the Defendant took Mr. Ferwanah home and cleaned him up. However, the trial court found that the statutory mitigating factor was "tempered" by the fact that the Defendant "was trying to cover his tracks a little bit[.]" The trial court also found that the Defendant was a good father and had "employed other individuals" as "a long-time businessman[.]" The trial court noted that the Defendant had been generous and helpful towards others. The trial court believed that the Defendant's apology for his offenses was sincere.

The trial court ordered the Defendant to serve a sentence of twelve years in TDOC for count one, aggravated kidnapping. Regarding count two, especially aggravated

---

[4] As explained later in this opinion, the trial court was incorrect in its statement that "exceptional cruelty" was an element of especially aggravated kidnapping or aggravated assault.

kidnapping, the trial court ordered the Defendant to serve a sentence of seventeen years in TDOC. The trial court ordered the Defendant to serve sentences of six years for counts three and four. The trial court ordered all the Defendant's sentences to be concurrently aligned. The trial court merged count one into count two and count four into count three. Thus, the Defendant received a total effective sentence of seventeen years at 100% release eligibility.

The Defendant filed a timely motion for new trial, which the trial court denied. The Defendant now timely appeals the trial court's judgments.

## II. Analysis

### *Motion to dismiss the indictment*

The Defendant argues that his second trial violates the prohibition against double jeopardy. He contends that the trial court erred by "allow[ing] the State, with all its resources and power, to make repeated attempts to convict [the Defendant] for the alleged offenses, subjecting him to embarrassment, expense and ordeal[,] and compelling him to live in a continuing state of anxiety and insecurity before his second trial." The State asserts that the trial court properly denied the Defendant's motion to dismiss the indictment because the State did not intentionally elicit Mr. Akila's statement in the first trial, and the Defendant "has not shown that the State was trying to provoke [the Defendant] into seeking a mistrial, which is necessary for double jeopardy to bar retrial here."

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, states, "No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Similarly, the Tennessee Constitution guarantees "[t]hat no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. I, § 10. Both clauses provide three distinct protections: "(1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." *State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012).

In *State v. Tucker*, 728 S.W.2d 27, 31 (Tenn. 1986), our supreme court adopted the standard set out in *Oregon v. Kennedy*, 456 U.S. 667 (1982), for determining when prosecutorial misconduct will bar a retrial. In *Tucker*, our supreme court held that "[o]nly when it is shown that the prosecutor is 'goading' the defense into moving for a mistrial will double jeopardy bar a retrial." 728 S.W.2d at 31. The Tennessee Supreme Court stated that, "when the case is collapsing around the prosecutor because the witnesses are

- 12 -

weaker than expected, adverse rulings have kept out important evidence, or key witnesses cannot be found or did not appear, the trial judge can infer the prosecutor's intent and reach the conclusion that a mistrial was actually desired." *Id.*

In *State v. Clint Elmore*, No. 03C01-9403-CR-00119, 1995 WL 84447, at *1 (Tenn. Crim. App. Feb. 28, 1995), *perm. app. denied* (Tenn. July 10, 1995), the defendant was charged with aggravated rape of a ten-year-old victim. The trial court granted the defendant's motion in limine to limit the victim's testimony to exclude references to any other victims. *Id.* When the victim testified at trial, he mentioned his sister. *Id.* The trial court granted the defendant's motion for mistrial but "specifically found that there was no prosecutorial misconduct." *Id.* On appeal, the defendant argued that a retrial would violate double jeopardy because the State's actions were intended to goad the defendant into seeking a mistrial. *Id.* This court concluded that, prior to the victim's testimony, the State explained to the victim the limitations on his testimony. *Id.* at *2. This court stated that "[i]t [wa]s clear that the *questions* which prompted the controversial responses were not designed to insinuate that the [defendant] had molested other children, but rather were asked in order to show the sequence of events surrounding the abuse and its effect on the victim." *Id.* (emphasis in original). Thus, this court concluded that the State's question was not intended to provoke the defendant to request a mistrial and affirmed the trial court's denial of the defendant's motion to dismiss. *Id.* at *2-3.

"The defendant bears the burden of showing that the evidence preponderates against the trial court's [factual] findings" regarding the prosecutor's intent to "goad" the defendant into moving for a mistrial. *State v. Huskey*, 66 S.W.3d 905, 917 (Tenn. Crim. App. 2001).

At the Defendant's first trial, Mr. Akila stated that the Defendant "also doubted his wife at a previous occasion with another friend of his, and [the Defendant] pulled a gun on [his friend]." The Defendant objected, and the trial court held a jury-out hearing on the Defendant's motion for a mistrial. The State argued that Mr. Akila's statement was non-responsive to the State's question: "Mr. Akila, were you aware of the [D]efendant taking any action because of his suspicions?" The prosecutor additionally noted that it had spoken with Mr. Akila about the testimony prior to trial and did not anticipate bringing out the testimony during direct examination. The State alternatively argued that it was not required to give the Defendant notice of its intent to introduce evidence under Tennessee Rule of Evidence 404(b) and that the statement was relevant to the Defendant's motive and intent to commit the current offenses. The trial court noted that Mr. Akila's statement discussed an event that was "almost identical" to the current offenses. Thus, the trial court held that a reasonable juror could not disregard the

- 13 -

testimony and declared a mistrial. The trial court stated that it did not believe that the prosecutor intentionally solicited the statement from Mr. Akila.

The Defendant filed a motion to dismiss the indictment, arguing that a second trial on the charges would violate double jeopardy and his right to due process. The Defendant asserted that, at his first trial, the State elicited improper testimony from Mr. Akila, which resulted in the mistrial. In a written order, the trial court denied the Defendant's motion to dismiss the indictment. The trial court found that the State did not elicit Mr. Akila's statement in the first trial and that the State was not attempting to goad the Defendant into requesting a mistrial. Thus, the trial court found that "manifest necessity did exist to declare a mistrial and that retrial does not violate due process or double jeopardy." The Defendant then filed a motion to stay the trial proceedings and filed an application for permission to appeal to the Tennessee Court of Criminal Appeals under Tennessee Rule of Appellate Procedure 9. The trial court denied the Defendant's Rule 9 application for permission to appeal and his motion to stay the proceedings. The Defendant then filed an extraordinary appeal under Tennessee Rule of Appellate Procedure 10 with the Tennessee Court of Criminal Appeals. This court stayed the trial proceedings, *see* Tenn. R. App. P. 10(a), but later denied the Defendant's Rule 10 extraordinary appeal. This court concluded that, the trial court had not departed from the accepted and usual course of judicial proceedings in its denial of the Defendant's motion to dismiss the indictment. The Defendant then proceeded to his second trial.

Prior to Mr. Akila's testimony at the Defendant's second trial, the Defendant renewed his motion to dismiss the indictment on double jeopardy grounds and asserted that Mr. Akila intentionally mentioned the prior incident in his first trial. The trial court stated that "[t]he State did not ask anything to try to elicit that response from the witness." The trial court again denied the Defendant's motion to dismiss the indictment. The trial court also instructed Mr. Akila, outside of the jury's presence, to refrain from mentioning any prior incidents with the Defendant.

Similar to this court's conclusion in *Clint Elmore*, we conclude that the State did not intend to goad the Defendant into requesting a mistrial by asking Mr. Akila the following question: "Mr. Akila, were you aware of the [D]efendant taking any action because of his suspicions?" At the Defendant's first trial, the State noted that it had spoken with Mr. Akila prior to his testimony and did not intend on eliciting the objectionable testimony. The Defendant has not presented any proof that the State intentionally asked Mr. Akila whether he knew if the Defendant had acted on his suspicions that his wife was having an affair for the purpose of goading the Defendant into requesting a mistrial. The trial court did not err in denying the Defendant's motion to dismiss the indictment, and the State was not barred from retrying the Defendant by double jeopardy.

## *Motion for mistrial*

Next, the Defendant asserts that the trial court erred in denying his motion for mistrial because Mr. Ferwanah testified that the Defendant should take the stand. He argues that a mistrial was necessary because the jury heard Mr. Ferwanah's statement, and "no reasonable trier of fact could reach an impartial verdict after such a dramatic statement of potential guilt." The State contends that the trial court properly denied the motion for mistrial because the State did not elicit the comment, and "the trial court repeatedly instructed the jury that [the Defendant] was not required to testify, including right after the outburst, ensuring that the jury understood [the Defendant]'s right to remain silent."

The decision of whether to grant a mistrial is within the sound discretion of the trial court. *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). Normally, a mistrial should be declared only in the event that a manifest necessity requires such action. *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. *Id.* This court will not disturb the trial court's decision unless there is an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990). In evaluating whether the trial court abused its discretion, we may consider: "(1) whether the State elicited the testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's proof." *State v. Welcome*, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007).

During Mr. Ferwanah's cross-examination, the following exchange occurred:

[TRIAL COUNSEL:] And what you're concerned with is the beating, not anything else; is that true, sir?

[MR. FERWANAH:] For everything he did to me, for the look when I look in my kids' eyes the next day, because when he took me home, my kids walk up there -- they were in bed, they walk up, they looked at me, they saw me how I looked, what he did to me. The next day and the next day when they all come in the middle of the night, my children, I look at them and I cry.

[TRIAL COUNSEL:] Well -

- 15 -

[MR. FERWANAH:]  We had to take them to therapy, the whole family, so they can (inaudible) what he did to them.

[TRIAL COUNSEL:]  And my question, sir, was, that you were concerned with the beating; is that correct?

[MR. FERWANAH:]  What do you mean, I was concerned --

[THE STATE]: Asked and answered.

THE [TRIAL] COURT:  I'm not -- can you rephrase?  I think you're asking is there something other than the beating.

[TRIAL COUNSEL]: Okay.

[TRIAL COUNSEL:]  So that when Mr. Akila and, what you say, [the Defendant] did about carrying you down the hallway, not -- you're not concerned about that, about what Mr. Akila and what you say [the Defendant] did about throwing you into the garage?  You're not concerned about that; is that correct?

[MR. FERWANAH:]  I'm concerned about all that, all that happened, all what he did.

[TRIAL COUNSEL:]  But Mr.

[MR. FERWANAH:]  He did all that.  How can that man sit here and say he didn't do [sic]?  Take the stand.  Be a man and acknowledge what you did.

THE [TRIAL] COURT:  You need to wait.

[TRIAL COUNSEL:]  Your Honor, may we approach?

[MR. FERWANAH:]  I'm sorry.  I'm sorry, Your Honor.

THE [TRIAL] COURT:  That's all right.  We're just going to take a recess so we can calm down.  Please don't discuss this case among yourselves.  You may leave your notebooks in your chairs.  I'll see you in a few minutes.

- 16 -

. . . .

THE [TRIAL] COURT:  All right, folks.  You can have a seat.  [trial counsel].

[TRIAL COUNSEL:]  Your Honor, we are, again, in a position that we would move for a mistrial because of the insistence by Mr. Ferwanah that, quote, [the Defendant] be a man and take the stand and admit what he did.  Your Honor, that is an improper comment on my client's right to remain silent, be it by the State or a State's witness, it is still an improper comment.  Whatever the emotional concerns were or not, this is a totally improper comment.  We cannot get past it by the jury being told that, well, [the Defendant] has a right to remain silent, when you got somebody in the emotional state that Mr. Ferwanah has and being non-responsive to the question, talking about [the Defendant] taking the stand and being a man and admitting what he did.

THE [TRIAL] COURT:  All right.  I'm going to deny your Motion for Mistrial.  We did spend a lot of time on this during voir dire and even excused one potential juror because he said that . . . would be stuck in his mind, that he'd be wondering what the person would say.

And so, Mr. Ferwanah, you can't comment on him not testifying.  I understand.  You're very emotional.  It's a very stressful situation.

I'm going to instruct the jury to disregard that.  I instructed them already.  They've heard this instruction before.  I've read it to them during jury selection and I'm going to read it to them again at the end, but I'll tell them to disregard Mr. Ferwanah's statement.

I certainly think that the jury understands the law.  The fact that Mr. Ferwanah said that is really no different than us commenting on it during voir dire, that, certainly -- Mr. Ferwanah's opinion is, is that he should get up and testify.  The jury knows he doesn't have to do that.  And they have been instructed already and will be instructed again that they are not to place any significance on the fact that if [the Defendant] chooses not to testify or to put on any evidence, and I'll tell them to disregard that statement.  I think everybody understands that was a heat-of-the-moment statement made out of frustration by Mr. Ferwanah, so . . .

- 17 -

I'm going to deny your Motion for Mistrial. I don't think there's manifest necessity for it. I think the jury can follow my instructions on that.

While the jury was still out of the courtroom, the Defendant requested that the trial court also give "the no prejudice or sympathy instruction." The trial court stated the following:

THE [TRIAL] COURT: I don't think I need to -- to add that in. I mean, you were yelling earlier. . . . I don't know if you know it, but you get really aggressive and your voice gets raised and I didn't ask you to calm down. I think . . . the jury understands it's a stressful situation. You're trying to represent your client as zealously as possibly. And I think Mr. Ferwanah finally just got pushed over the edge and -- I don't think your questions were inappropriate. You weren't yelling when you asked that one. It's just earlier, I think . . . your tone of voice kind of built up a very adversarial situation, so . . .

I'm just going to ask that everybody calm down. We're going to take a recess. We'll collect our . . . thoughts. I don't think I need to give any additional instructions other than disregard the statement about testifying.

After the jury returned to the courtroom, the trial court instructed the jury to "disregard and strike from the record of your proceedings the statement of Mr. Ferwanah challenging the defendant to testify." The trial court also instructed the jury that it could not consider the fact that the Defendant testified or did not testify at trial.

Here, we conclude that the trial court did not err in denying the Defendant's motion for mistrial. The State did not elicit Mr. Ferwanah's statement. During the Defendant's cross-examination of Mr. Ferwanah, trial counsel conducted a line of questioning regarding what concerned Mr. Ferwanah most about the offenses. Mr. Ferwanah apparently became emotional, and his outburst challenging the Defendant to take the stand was non-responsive to trial counsel's question. Additionally, the trial court instructed the jury to disregard Mr. Ferwanah's statement, and we must presume that the jury followed the trial court's instruction. *State v. Reid*, 91 S.W.3d 247, 279 (Tenn. 2002) (citing *State v. Stout*, 46 S.W.3d 689, 715 (Tenn. 2001); *State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998)). Lastly, we conclude that the State's proof in this case was strong. Both the Defendant's accomplice, Mr. Akila, and the victim, Mr. Ferwanah, testified that the Defendant tricked Mr. Ferwanah into being tied up, and with the assistance of Mr. Desouzaneti, took Mr. Ferwanah into the garage and beat him severely.

Thus, the trial court properly determined that there was no manifest necessity for a mistrial.

Further, the Defendant argues that "Mr. Ferwanah's challenge[] and the subsequent denial of the motion for mistrial[] violated his constitutional right to a fair trial." The Defendant cites to the Fourteenth Amendment of the United States Constitution, and Article I, section eight of the Tennessee Constitution, and argues that the trial court's instruction was insufficient to resolve the error committed when Mr. Ferwanah told the Defendant to "[b]e a man" and "[t]ake the stand[.]" The State notes that the trial court instructed the jury several times to disregard Mr. Ferwanah's statements, and "the trial court reasonably concluded that multiple curative instructions were sufficient to mitigate [Mr.] Ferwanah's outburst."

The United States Constitution and the Tennessee state constitution guarantee criminal defendants the right to trial by jury. U.S. Const. amend. VI; Tenn. Const. art. I, § 6 (providing "that the right of trial by jury shall remain inviolate"). We have already concluded that Mr. Ferwanah's outburst did not create the manifest necessity for a mistrial. We agree with the State that the trial court's prompt action of sending the jurors out, holding a jury-out sidebar, and instructing the jury upon its return ensured that the Defendant's right to a fair trial was not violated. The Defendant is not entitled to relief on this ground.

### *Improper prosecutorial comment on the right not to testify*

The Defendant further argues that Mr. Ferwanah's statement violated his right to remain silent and constituted prosecutorial misconduct because Mr. Ferwanah was a witness of the State. The State asserts that Mr. Ferwanah's outburst was not elicited by the State and notes that the trial court instructed the jury several times regarding the Defendant's right to testify or not testify.

Both the United States Constitution and the Tennessee Constitution "guarantee criminal defendants the right to remain silent and the right not to testify at trial." *State v. Jackson*, 444 S.W.3d 554, 585 (Tenn. 2014). The Tennessee Supreme Court has previously cautioned that "[t]he subject of a defendant's right not to testify should be considered off limits to any conscientious prosecutor." *Id.* at 586 (quoting *State v. Hale*, 672 S.W.2d 201, 203 (Tenn. 1984)) (internal quotation marks omitted). In addition to direct comments on a defendant's decision not to testify, "indirect references on the failure to testify also can violate the Fifth Amendment privilege." *Id.* at 587 (quoting *Byrd v. Collins*, 209 F.3d 486, 533 (6th Cir. 2000)) (internal quotation marks omitted).

In *Jackson*, our supreme court overturned a second-degree murder conviction where the prosecutor, during closing rebuttal argument, "walked across the court room, stood in front of [the d]efendant, gestured toward her, and demanded in a loud voice, 'Just tell us where you were! That's all we are asking, Noura!'" *Id.* at 585, 602. In its ruling, the court adopted a two-part test for determining whether a prosecutor's remark amounts to an improper comment on a defendant's constitutional right to remain silent and not testify. *Id.* at 587-88. The two-part test analyzes: "(1) whether the prosecutor's manifest intent was to comment on the defendant's right not to testify; or (2) whether the prosecutor's remark was of such a character that the jury would necessarily have taken it to be a comment on the defendant's failure to testify." *Id.* at 588. This court reviews a defendant's claim of impermissible prosecutorial comment on the right not to testify de novo. *Id.*

In the case at hand, we conclude that the State did not improperly comment on the Defendant's right to testify or remain silent. Most notably, Mr. Ferwanah challenged the Defendant to testify during the defense's cross-examination. While Mr. Ferwanah testified for the State, it is clear that the State had no role in eliciting Mr. Ferwanah's statement. Thus, we conclude that the State had no manifest intent to comment on the Defendant's right to testify. The Defendant is not entitled to relief on this ground.

### *Cross-examination of Mr. Akila*

Prior to Mr. Akila's testimony at the Defendant's second trial, the trial court addressed the issue of Mr. Akila's testimony regarding his plea agreement during a jury-out hearing. The trial court stated the following:

> When a co-defendant is charged with the exact same thing, the statute that prohibits you [from] talking about sentencing applies to co-defendants. It's a tricky road you got . . . to follow. And I think you . . . managed it well with Mr. Ferwanah, about his understanding. But when you come time to question Mr. Akila, you can't talk to him about any specific length of time that he's . . . looking at. You can talk about, you know, you're eligible for probation, you're eligible for diversion. You can ask him that, but you can't talk about specific lengths of prison sentences.

During Mr. Akila's cross-examination, the following exchange occurred:

[TRIAL COUNSEL]: Your Honor, may we approach?

THE [TRIAL] COURT: Yes, sir.

- 20 -

(Bench conference:)

[TRIAL COUNSEL]: I don't want to violate Your Honor's rule. I need to know the questions that I can ask him about the penalty that he was facing.

THE [TRIAL] COURT: The substance of it is, is that your understanding is that you're getting a significantly reduced sentence than what you were facing, your original charge. Does that make sense?

[TRIAL COUNSEL]: And that's the limitation that I can --

THE [TRIAL] COURT: I think you've already asked. I mean, that's the substance of what you can get to.

[TRIAL COUNSEL]: Okay.

THE [TRIAL] COURT: Nothing about time percentages.

(Open court:)

[TRIAL COUNSEL:] Mr. Akila, you understand that by your coming to court today and testifying in front of this jury, that you are to receive a significantly reduced punishment for what you were charged with?

[MR. AKILA:] I do know I was offered two years' probation and judicial diversion if the Judge accepts that, in return.

[TRIAL COUNSEL:] My question is, you understand that that is a significant reduction from the offenses that you are currently charged with?

[MR. AKILA:] I don't know what's the scale of the significant is.

[TRIAL COUNSEL]: Your Honor, I understand I can't ask another question; that correct?

THE [TRIAL] COURT: Will you approach?

(Bench conference:)

- 21 -

THE [TRIAL] COURT:  Follow-up question is, you do understand that you were facing a larger sentence than what you're getting now?  If he doesn't, then we send the jury out and we'll talk about it.  So ask him that and see what he says.

[TRIAL COUNSEL]:  I'll ask him that way.

(Open court:)

[TRIAL COUNSEL:]  You understand that your agreement allows you to receive a much reduced sentence from the harsher punishment that you were facing?

[MR. AKILA:]  Correct.

*Harmless Error Review*

The Defendant asserts that the trial court erred in limiting his cross-examination of Mr. Akila regarding his plea agreement with the State because "Tennessee courts have not interpreted Tenn[essee] Code Ann[otated] [section] 40-35-201(b) as an absolute bar to the cross-examination of witnesses, or other presentation of proof and argument, that may inadvertently comment upon sentences."  The State contends that the trial court's limitation was within its discretion because further discussion of Mr. Akila's plea agreement would have revealed the Defendant's sentence exposure to the jury, which would have violated section 40-35-201(b).  The State also argues that "when a defendant offers testimony that a co-defendant is receiving a favorable sentence in return for testifying, a co-defendant's possible sentence without a plea is only marginally relevant to his bias."

"The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the sound discretion of the trial court."  *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995) (citing *Coffee v. State*, 216 S.W.2d 702, 703 (Tenn. 1948); *Davis v. State*, 212 S.W.2d 374, 375 (Tenn. 1948)).  Absent a clear abuse of discretion that results in manifest prejudice to the defendant, this court will not interfere with the trial court's exercise of its discretion on matters pertaining to the examination of witnesses.  *State v. Johnson*, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984) (citing *Monts v. State*, 379 S.W.2d 34 (Tenn. 1964)).  The trial court has authority to "exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel."  Tenn. R. Evid. 611(a).

In *State v. Bolden*, the Tennessee Supreme Court held that the following safeguards should "be followed before admitting testimony procured through plea bargain agreements[:]"

> (1) full disclosure of the terms of the agreements struck with the witnesses; (2) the opportunity for full cross-examination of those witnesses concerning the agreements and the effect of those agreements on the testimony of the witnesses; and (3) instructions cautioning the jury to carefully evaluate the weight and credibility of the testimony of such witnesses who have been induced by agreements with the State to testify against the defendant.

979 S.W.2d 587, 590 (Tenn. 1998) (internal citations omitted). In *State v. Paul Spears*, this court stated that "[t]he essence of *Bolden* is that the defense must be given wide latitude in cross-examination of a plea-bargaining accomplice *regarding the terms of the plea agreement, actions or promises of the prosecution, and any other facts bearing on the truthfulness or credibility of the accomplice*." No. E1999-00383-CCA-R3-CD, 2000 WL 760758, at *4 (Tenn. Crim. App. June 13, 2000) (emphasis in original), *perm. app. denied* (Tenn. Dec. 27, 2000).

Tennessee Code Annotated section 40-35-201(b) states that "[i]n all contested criminal cases, . . . the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged nor all lesser included offenses." Tenn. Code Ann. § 40-35-201(b).

In *State v. Jereco Tynes*, No. W2010-02511-CCA-R3-CD, 2013 WL 1043202, at *13 (Tenn. Crim. App. Mar. 13, 2013), *perm. app. denied* (Tenn. June 11, 2013), the defendant argued on appeal that the trial court committed plain error and violated his right to confrontation by "not permitting him to cross-examine [the co-defendants] to establish that, prior to their guilty pleas to second degree murder, they each faced the possibility of life in prison on the original charge of first degree felony murder." This court conducted a plain error review of the issue and held that, "under the facts and circumstances of this case, the trial court did not abuse its discretion in prohibiting the defense from cross[-]examining [the co-defendants] about their total sentence exposure prior to pleading guilty." *Id.* at *14. This court noted that because the co-defendants were charged with first degree felony murder, the defendant's "eliciting the penalties they faced on that charge simultaneously would have informed the jury about the penalties the [d]efendant also faced." *Id.* This court also concluded that "the trial court allowed sufficient cross-examination to inform the jury that [the co-defendants] pled guilty to a lesser offense than first degree murder and, accordingly, received a lower sentence" which "allowed the jury to discount [the co-defendant]'s testimony as it deemed appropriate." *Id.* at *15. Further, this court concluded that a trial court does not abuse its

discretion by "preventing a defendant from examining a witness about the exact range of potential sentences [the witness] faced because such information is not necessary to uncover any bias and would add only marginally to the jury's understanding of [the witness'] credibility." *Id.* (quoting *State v. Alejandro Chevo Guana*, No. W2008-01304-CCA-R3-CD, 2010 WL 2593631, at *8 (Tenn. Crim. App. June 29, 2010), *perm. app. denied* (Tenn. Nov. 18, 2010)) (internal quotation marks omitted) (alterations in original).

In *State v. Lamar Parrish Carter*, No. M2012-01734-CCA-R9-CD, 2013 WL 4680401, at *2 (Tenn. Crim. App. Aug. 29, 2013), *perm. app. granted* (Tenn. Jan. 15, 2014), *app. dismissed* (Tenn. Jan. 27, 2017), the trial court declared a mistrial after trial counsel asked the co-defendant about his sentencing exposure for the offenses. On appeal, the defendant argued that there was no manifest necessity for a mistrial and that the trial court erred in limiting his cross-examination of a witness. *Id.* at *3. This court held that the trial court acted within its discretion to declare a mistrial when trial counsel "exposed the jury to statutorily prohibited information." *Id.*

We conclude that the trial court did not abuse its discretion by limiting the Defendant's cross-examination of Mr. Akila regarding Mr. Akila's sentencing exposure. Here, the Defendant and Mr. Akila were charged for the same offenses against Mr. Ferwanah. Mr. Akila negotiated a plea agreement with the State to testify truthfully in the Defendant's trial in exchange for a plea to the lesser-included offense of accessory after the fact and a sentence of two years' probation. On cross-examination, Mr. Akila agreed that his plea-bargained sentence was less than his original sentencing exposure. The Defendant made the jury aware of Mr. Akila's potential bias through his cross-examination of Mr. Akila regarding his plea negotiations with the State. Any further delving into Mr. Akila's original sentencing exposure would have likely violated Tennessee Code Annotated section 40-35-201(b) by exposing the jury to the possible sentences for the Defendant's charged offenses. Further, more information about Mr. Akila's sentencing exposure would have had minimal probative value because the jury was already aware that Mr. Akila received a much reduced sentence in exchange for truthful testimony. Thus, we conclude the trial court properly limited the Defendant's cross-examination of Mr. Akila regarding his sentencing exposure. *See Jereco Tynes*, 2013 WL 1043202 at *14-15; *but see State v. Kenneth Kissamore*, No. M2010-01565-CCA-R3-CD, 2011 WL 2474061, at *3-4 (Tenn. Crim. App. June 21, 2011) ("[S]ection 40-35-201(b) does not by its terms prohibit a comment on the actual sentence received by one other than the criminal defendant himself."), *perm. app. denied* (Tenn. Oct. 19, 2011). The Defendant is not entitled to relief on this ground.

*Confrontation Clause*

The Defendant also argues that "[t]he limitations on [the Defendant]'s cross-examination deprived him of his constitutional right to effectively confront the witnesses against him, specifically a co-defendant who had gained more than fifteen (15) years of freedom and a clean criminal record by testifying for the State against [the Defendant]."

In a criminal trial, the defendant has a right "to be confronted with the witnesses against him." U.S. Const. amend. VI. Similarly, the Tennessee Constitution provides "[t]hat in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face." Tenn. Const. art. I, § 9. Our supreme court has described the Tennessee Constitution as imposing "a higher right than that found in the federal constitution." *State v. Deuter*, 839 S.W.2d 391, 395 (Tenn. 1992). However, "when deciding claims based on the right to confrontation provided in article I, section 9, we have expressly adopted and applied the same analysis used to evaluate claims based on the Confrontation Clause of the Sixth Amendment." *State v. Dotson*, 450 S.W.3d 1, 62 (Tenn. 2014).

A defendant's right to cross-examine witnesses does not preclude a trial court from imposing limits upon the cross-examination of witnesses, taking into account such factors as "harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994). A defendant's right to cross-examine witnesses also "does not mean that a defendant has a right to present irrelevant evidence." *State v. Sheline*, 955 S.W.2d 42, 47 (Tenn. 1997).

The United States Supreme Court has stated that even "a constitutionally improper denial of a defendant's opportunity" to confront a witness against him, "like other Confrontation Clause errors, is subject to [a] . . . harmless error analysis." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). The Supreme Court set out the following test:

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the [defendant]'s case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the [defendant]'s case.

*Id.* (internal citations omitted).

Here, we conclude that the trial court's limitation on the Defendant's cross-examination of Mr. Akila did not violate the Defendant's constitutional right to confront witnesses. We believe that Mr. Akila's testimony that he was originally charged with felonies was not salient to the Defendant's case and that this testimony would have been cumulative. The trial court allowed the Defendant to elicit testimony from Mr. Akila that showed that he received a favorable plea offer from the State; this showed the jury that Mr. Akila could have had a bias in favor of the State. Trial counsel asked Mr. Akila several times whether he was aware that he received a significantly reduced sentence through the State's plea offer, and Mr. Akila agreed that he received a reduced sentence. Information about the exact charges that Mr. Akila originally faced and his original sentencing exposure would not likely have affected Mr. Akila's credibility in the jury's eyes. Additionally, we note that the State had a strong case against the Defendant. The victim, Mr. Ferwanah, and the co-defendant, Mr. Akila, both testified that the Defendant restrained Mr. Akila, and with the help of another, removed Mr. Ferwanah to the garage, assaulted him and threatened to kill him. Thus, we conclude that the trial court did not infringe on the Defendant's right to confront Mr. Akila by limiting the scope of cross-examination. The Defendant is not entitled to relief.

### *Admissibility of Mr. Damiri's testimony*

The Defendant argues that the trial court erred by excluding testimony from Mr. Damiri regarding a monetary agreement among the Defendant, Mr. Ferwanah, and their representatives. The Defendant also asserts that the trial court erred in excluding Mr. Damiri's testimony that Mr. Ferwanah cursed at some of the Defendant's witnesses, including Mr. Damiri, outside of the courtroom. The Defendant contends that the testimony was relevant to show Mr. Ferwanah's bias against the Defendant and that the limitation more probably than not affected the verdict. The State argues that the trial court properly excluded the testimony because it made "no fact at issue more or less probable, and the trial court reasonably found it immaterial."

Generally, "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this [c]ourt will not interfere in the absence of abuse appearing on the face of the record." *State v. Plyant*, 263 S.W.3d 854, 870 (Tenn. 2008). A trial court abuses its discretion when it "applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *Id.* (citing *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006)).

In order for evidence to be admissible, it must be relevant. Tenn. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of

consequence to the determination of the action more probable or less probable than it would without the evidence." Tenn. R. Evid. 401. However, even if evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Tenn. R. Evid. 403. "A witness may be cross-examined on any matter relevant to any issue in the case, including credibility[.]" Tenn. R. Evid. 611(b). "A party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." Tenn. R. Evid. 616.

During a jury-out hearing, the Defendant proffered Ramadan Damiri's testimony to the trial court. Mr. Damiri stated that he was a member of the Islamic community in Nashville and had known the Defendant for twenty years. In April 2012, Mr. Damiri visited Mr. Ferwanah at Mr. Ferwanah's residence. Mr. Ferwanah's uncle and father-in-law were also visiting. Mr. Damiri discussed the possibility of "resolv[ing] the problem peacefully" with the men. Mr. Damiri later met with a man named Mohammed[5] and Mr. Ferwanah's father-in-law at a restaurant to discuss the offenses. Because Mr. Ferwanah's father-in-law agreed to meet with Mr. Damiri while Mr. Ferwanah was present, Mr. Damiri understood that Mr. Ferwanah's father-in-law represented Mr. Ferwanah's interests in the discussions. At the restaurant, Mr. Damiri, Mohammed, and Mr. Ferwanah's father-in-law discussed how Mr. Ferwanah should be compensated "to alleviate suffering by giving some monetary amount and paying some of his medical bills, basically." The men met at least three times to discuss compensation. At the final meeting, Mr. Ferwanah's father-in-law informed Mr. Damiri and Mohammed that "he would settle the issue" for $3,500,000. The father-in-law informed Mr. Damiri and Mohammed that he would accept $2,500,000 in cash and the remaining $1,000,000 in payments. He also set a deadline of forty-eight hours for delivery of the cash payment. Mr. Damiri stated that Mr. Ferwanah had not filed his civil lawsuit against the Defendant, Electronics Tech, and Mr. Akila when these discussions took place.

The trial court denied the Defendant's motion to admit Mr. Damiri's testimony and stated the following:

> All right. Well, here's what I think. I -- when you're trying to show bias of a witness, or particularly a victim, certainly, any monetary concerns are always fertile ground for that. I think the defense has started from opening statement, all the way through their cross-examination of Mr. Ferwanah, that that's an issue. And so I think they've raised the issue. I think the proof has made it an issue. And so the defense should be able to

---

[5] The record is unclear regarding Mohammed's relationship to the Defendant or Mr. Ferwanah.

establish that, if they can.  And they've asked Mr. Ferwanah about the civil lawsuit, which he's admitted to and talked about the amount of money here.

What is concerning to me about this -- and the reason I asked the State if they're objecting to it is because it sounds to me like the Muslim community believes this happened.  And they're coming in to try to settle this peacefully between the parties instead of coming into courts.

. . . .

I heard no proof that Mr. Ferwanah instigated this.  It sounded to me like this witness, being part of the Islamic community, took the steps to try to reach a peaceful settlement here.  Although, it could be argued that Mr. Ferwanah's father-in-law was acting as his agent, we haven't heard that from the father-in-law.  There's some -- something's being made here, the father-in-law very well may have been acting on his own.  What we don't have is any statement[] from Mr. Ferwanah himself about demanding the 2.5 or 3.5 million dollars, 2.5 in cash.

The proof that's been presented to me seems more like the cultural community, following their cultural norm, to try to reach a peaceful settlement without going to court.  That, to me, does not play at all into the bias -- the alleged bias of Mr. Ferwanah or seeking money in this.  Obviously, there hasn't been any settlement or we would have heard about it.

So I think that the testimony of [Mr. Damari] . . . I don't think that goes to show that Mr. Ferwanah was seeking money in this.  And so I'm going to deny your request to introduce the testimony . . . that Mr. Damari just presented.

Later, Mr. Damiri made another proffer regarding his opinion of the Defendant's character and reputation.  Mr. Damiri also stated that, while he was outside the courtroom during a recess, Mr. Ferwanah cursed at Mr. Damiri and Mr. Ramadan while returning to the courtroom.  The trial court ruled that this testimony was inadmissible because it did not show bias and was not related to a material issue.

We conclude that the trial court did not err in excluding Mr. Damiri's testimony regarding the monetary negotiations between the Defendant and Mr. Ferwanah or the testimony regarding Mr. Ferwanah cursing at Mr. Damiri and Mr. Ramadan.  We agree with the trial court that Mr. Damiri's proffered testimony was not relevant to any material

- 28 -

issues at trial. While the Defendant had raised the issue of Mr. Ferwanah's bias against him through proof of Mr. Ferwanah's civil suit, the proffered testimony did not tend to make Mr. Ferwanah's bias any more probable. The testimony was speculative, unclear, and did not sufficiently establish that Mr. Ferwanah's father-in-law was acting as Mr. Ferwanah's agent or acting as a leader in the Muslim community. Additionally, it is unclear whether Mr. Damiri and Mohammed accepted Mr. Ferwanah's offer on behalf of the Defendant. Because Mr. Damiri's proffered testimony was unclear and speculative, the trial court did not abuse its discretion by excluding the testimony. The Defendant is not entitled to relief on this ground.

### *Denial of court-appointed certified interpreter*

The Defendant asserts that the trial court erred by allowing Mr. Ferwanah and Mr. Akila to "testify in English regarding conversations that took place in Arabic without the requirement or benefit of a certified or court-appointed translator, . . . rendering the unofficial translations of the unqualified lay witnesses as unreliable, prejudicial, and inadmissible, violating constitutional due process and the Tennessee Rules of Evidence." The State contends that the trial court did not "appoint" Mr. Ferwanah and Mr. Akila to be interpreters and that the trial court properly allowed Mr. Ferwanah and Mr. Akila to testify in English about conversations that were originally spoken in Arabic. The State additionally argues that the Defendant failed to prove he was prejudiced by the trial court's decision because the Defendant did not "identify[] what conversations could be problematic or how [Mr.] Ferwanah and [Mr.] Akila might have misinterpreted what was said."

Tennessee Rule of Criminal Procedure 28 states that the trial court "may appoint an interpreter pursuant to section 3 of Tennessee Supreme Court Rule 42." Tenn. R. Crim. P. 28. Tennessee Supreme Court Rule 42, section 3 states the following:

> (a) Appointing an interpreter is a matter of judicial discretion. It is the responsibility of the court to determine whether a participant in a legal proceeding has a limited ability to understand and communicate in English. If the court determines that a participant has such limited ability, the court should appoint an interpreter pursuant to this rule.

> (b) Recognition of the need for an interpreter may arise from a request by a party or counsel, the court's own voir dire of a party or witness, or disclosures made to the court by parties, counsel, court employees or other persons familiar with the ability of the person to understand and communicate in English.

- 29 -

Tenn. Sup. Ct. R. 42: § 3(a)-(b).  Tennessee Rule of Evidence 604 states that "[a]n interpreter is subject to the provisions of these rules and applicable statutes relating to qualifications as an expert and the administration of an oath or affirmation to make a true interpretation."  Tenn. R. Evid. 604.  "Appointment of an interpreter of a witness's testimony in a criminal case is a matter for the trial court's discretion subject to reversal only for abuse of that discretion."  *State v. Van Tran*, 864 S.W.2d 465, 475 (Tenn. 1993).  A party contending that a translation of testimony is inaccurate must prove prejudice.  *Id.* at 476.

On May 12, 2014, Judge Mary Beth Leibowitz[6] granted the Defendant's motion for a continuance "due to need for the State to supply interpreter in [A]rabic language to translate [the] threat made to victim in [A]rabic language . . . ."

On September 23, 2014, the trial court filed an order that addressed the Defendant's motion to order witnesses to testify about prior statements in the language in which the statements were originally spoken.  The trial court noted that this was a matter of first impression.  The trial court stated the following:

> The court finds merit in the arguments for both sides.  All parties involved speak both English and Arabic.  The statements in question were made in Arabic.  What the hearer of those statements understood the meaning of those statements to be is highly relevant.  It makes sense that the hearer testify in English as to what he or she understood the words to mean.  On the other hand, the actual meaning, if different than the testimony of the hearer, would be relevant during cross-examination or as impeachment.
>
> Therefore, the court rules that the witness may testify in English as to what was said in Arabic.  However, he may be required during cross-examination to testify as to the actual Arabic words that were spoken.  The Defendant may have a certified interpreter present during this testimony.  The Defendant may present proof by the interpreter during the Defendant's case if he wishes to do so in order to impeach the hearer.

In this case, we conclude that the trial court did not err in declining to appoint a certified translator or by not requiring Mr. Ferwanah and Mr. Akila to testify in Arabic about statements made during the commission of the offenses.  There is no evidence that any "participant in [this] legal proceeding ha[d] a limited ability to understand and

---

[6] Judge Leibowitz retired between the May 12, 2014 hearing and the September 23, 2014 hearing on this issue.

communicate in English." *See* Tenn. Sup. Ct. R. 42, § 3(a). We note that the trial court permitted the Defendant to have a certified interpreter present during witness testimony to impeach the witness as to any Arabic translation. However, the Defendant did not take advantage of this portion of the trial court's order. The Defendant also did not make a proffer to the trial court to set out any inaccuracies in Mr. Akila or Mr. Ferwanah's testimony as to their testimony in English of conversations in Arabic. Thus, the Defendant cannot establish that he was prejudiced by the trial court's denial of an interpreter. *See Van Tran*, 864 S.W.2d at 476. He is not entitled to relief on this ground.

Additionally, the Defendant argues that:

> [b]ecause the trial [court] canceled the previously arranged interpreters' services, allowed the witnesses to translate the statements without giving the original quote or cultural contact, and refused to compel the state to provide written, Arabic statements[,] [the Defendant] was faced with the choice to waive his right against self-incrimination or to not put on proof to refute potentially biased, inaccurate testimony.

However, the record reflects that neither Judge Leibowitz nor the trial court ordered the appointment of an interpreter. As set out above, the trial court's order specifically allowed the Defendant to "have a certified interpreter present during this testimony" and to "present proof by the interpreter during the Defendant's case if he wishes to do so in order to impeach [Mr. Ferwanah's or Mr. Akila's testimony]." The Defendant did not retain a certified interpreter to observe testimony. He also did not object to any improper translations during Mr. Ferwanah's or Mr. Akila's testimony. Rule 36(a) of the Tennessee Rules of Appellate Procedure states that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." "The failure to make a contemporaneous objection constituted waiver of the issue on appeal." *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008). We conclude that this issue is waived due to the Defendant's failure to cite to applicable authorities in support of his argument as well as his failure to take action. In any event, we conclude that the Defendant's right against self-incrimination was not implicated by the trial court's actions because the Defendant had the ability to present his own interpreter as an expert witness. The Defendant is not entitled to relief on this ground.

### *Admission of the victim's medical records*

The Defendant argues that Mr. Ferwanah's medical records are testimonial statements that "were recorded not for the limited purpose of medical treatment, but for the later prosecution of [the Defendant]." He points out that "Mr. Ferwanah was taken to

the hospital after any emergency had ended, being transported after calling 911 and while law enforcement officers were present" and that "[h]is examination included both an interview and photographs taken by law enforcement." The Defendant asserts that admitting these records without the testimony of an expert witness "allow[ed] the jury to speculate about what happened without explanation or cross-examination, [which] violat[ed] [the Defendant]'s right to confront witnesses against him and prejudiced him severely." The State contends that the trial court properly admitted the medical records because they "were prepared as part of the hospital's treatment of [Mr.] Ferwanah's injuries, rather than as an attempt to accuse [the Defendant] of a crime."

As noted above, "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this [c]ourt will not interfere in the absence of abuse appearing on the face of the record." *State v. Plyant*, 263 S.W.3d 854, 870 (Tenn. 2008). A trial court abuses its discretion when it "applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *Id.* (citing *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006)).

In *State v. Cannon*, our supreme court stated the following:

[U]nder both the United States and the Tennessee Constitutions, the appropriate analysis for determining whether an out-of-court statement may be admitted into evidence without violating an accused's right of confrontation is as follows. A court must first determine whether the statement is testimonial or nontestimonial. Statements are testimonial if the primary purpose of the statement is to establish or to prove past events potentially relevant to later criminal prosecutions. A testimonial statement is inadmissible unless the State can establish that: "'(1) the declarant is unavailable and (2) the accused had a prior opportunity to cross-examine the declarant.'" If the statement is nontestimonial, the Confrontation Clause does not apply, and the statement must be analyzed under the "traditional limitations upon hearsay evidence."

254 S.W.3d 287, 303 (Tenn. 2008) (internal citations omitted).

In *Dotson*, the Tennessee Supreme Court adopted the District of Columbia Court of Appeals' reading of *Williams v. Illinois*, 567 U.S. 50 (2012) and held that "an out-of-court statement is testimonial under that precedent if its primary purpose is evidentiary and it is either a targeted accusation or sufficiently formal in character." *Dotson*, 450 S.W.3d at 69 (quoting *Young v. United States*, 63 A.3d 1033, 1043-44 (D.C. 2013)). "Whether the admission of hearsay statements violated a defendant's confrontation rights is a question of law subject to de novo review." *State v. Davis*, 466 S.W.3d 49, 68 (Tenn.

2015) (citing *State v. Lewis*, 235 S.W.3d 136, 141-42 (Tenn. 2007)). "'The application of the law to the facts found by the trial court is a question of law' that is subject to de novo review." *Lewis*, 235 S.W.3d at 142 (quoting *State v. Maclin*, 183 S.W.3d 335, 343 (Tenn. 2006)).

Prior to trial, the Defendant made an oral motion in limine, arguing that the introduction of the victim's medical records would violate the Defendant's right to confront witnesses because the State had only notified the Defendant that it would call Parkwest Hospital's records keeper. The trial court reserved its ruling for later in the trial.

After Mr. Ferwanah's testimony, the State sought to admit his medical records into evidence. The Defendant objected on the grounds of relevance because the two witnesses through whom the State sought to admit the records were records keepers, rather than medical personnel, but would also testify about Mr. Ferwanah's condition. The Defendant asserted that the introduction of the records through these witnesses would allow the jury to speculate as to the meaning of the information in the medical records. The Defendant also argued that the introduction of the medical records violated the Defendant's right to confront witnesses, violated the rule against hearsay, and that the prejudice to the Defendant would outweigh any probative value.

The trial court concluded that the affidavits of the custodians of the medical records authenticated the exhibits. The trial court held that the medical records were non-testimonial and thus, the Defendant's right to confront witnesses would not be violated by their admission. The trial court further held that the medical records were business records that were maintained in the hospital's regular course of business. The trial court concluded that the medical records were relevant to the issue of whether Mr. Ferwanah sustained a serious bodily injury during the offenses. The trial court further concluded that "that the probative value [wa]s high and the danger of unfair prejudice [wa]s low in this particular matter."

Nancy Dees testified that she worked as the custodian of records for Parkwest Hospital. The State admitted the records from Mr. Ferwanah's admission to Parkwest Hospital through Ms. Dees. Cheryl Green testified that she worked as the custodian of records for the University of Tennessee Medical Center. The State admitted the records from Mr. Ferwanah's admission to the University of Tennessee Medical Center through Ms. Green.

As the State notes in its brief, it is unclear which statements in Mr. Ferwanah's medical records the Defendant asserts are testimonial statements. The Defendant mentions that Mr. Ferwanah's "examination included both an interview and photographs

taken by law enforcement." Mr. Ferwanah testified that, while he was hospitalized, law enforcement took photographs of his injuries.

In the case *sub judice,* we conclude that the trial court properly admitted Mr. Ferwanah's medical records. Mr. Ferwanah's medical records from his admission to Parkwest Hospital do not contain any interview with law enforcement or any photographs. Thus, the Parkwest Hospital records are non-testimonial and were properly admitted. Mr. Ferwanah's medical records from his admission to the University of Tennessee Hospital trauma center also do not contain any interview with law enforcement or any photographs, and we conclude that the trial court also properly admitted these records as non-testimonial. We agree with the trial court that the medical records fell under the business records hearsay exception. *See Cannon*, 254 S.W.3d at 303 (stating that "to the extent medical records may be properly categorized as business records, such records are properly categorized as nontestimonial"). The Defendant is not entitled to relief on this ground.

### *Brady* violation

The Defendant asserts that the State violated *Brady v. Maryland*, 373 U.S. 83, 87 (1963), by failing to disclose that Mr. Ferwanah had received compensation from the State's Criminal Injuries Compensation Fund ("the Fund"). The Defendant states the following:

> Because [the Defendant] could only have known about the award of funds to Mr. Ferwanah by disclosure f[rom] the State, the State had notice that a crucial element to [the Defendant]'s defense was the improper financial motive of Mr. Ferwanah. Moreover, the State had knowledge that this claim not only contradicted Mr. Ferwanah's previous testimony but that it also contradicted the testimony it intended to offer against [the Defendant] at the retrial. Because the State failed to disclose the award of funds, a preponderance of the evidence shows that [the Defendant] was deprived of his constitutional right to a fair trial and his conviction must be reversed.

The State responds that the Defendant "failed to show that this evidence was within the prosecution's exclusive control, as the law surrounding the Fund indicates that it is not maintained by a prosecutorial entity" and that "the claim itself is cumulative to [the Defendant]'s other efforts to impeach [Mr.] Ferwanah, so there was no reasonable probability that it affected his verdict." The State also notes that the Public Records Act, Tennessee Code Annotated section 10-7-504(k), does not prohibit individuals from discovering a claim, a claimant's name, and the amount of the claim made to the Fund.

In *Brady*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In order to establish a *Brady* violation, four prerequisites must be met:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);

2. The State must have suppressed the information;

3. The information must have been favorable to the accused; and

4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). "[W]hen there has been a general request or no request for *Brady* information, the undisclosed information is 'material' if it 'creates a reasonable doubt that did not otherwise exist.'" *Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)). An omission of evidence must be evaluated in light of the entire record. *Agurs*, 427 U.S. at 112.

> The prosecution is not required to disclose information that the accused already possesses or is able to obtain, . . . or information which is not possessed by or under the control of the prosecution or another governmental agency. Nor is the prosecution required to seek out exculpatory evidence not already in its possession or in the possession of a governmental agency. When exculpatory evidence is equally available to the prosecution and the accused, the accused "must bear the responsibility of [his] failure to seek its discovery."

*State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992) (internal citations omitted) (some alterations in original). The defendant must prove, by a preponderance of the evidence, that a *Brady* violation has occurred. *Edgin*, 902 S.W.2d at 389.

In order to establish a *Brady* violation, the evidence need not be admissible; it only needs to be favorable to the defendant. *State v. Spurlock*, 874 S.W.2d 602, 609 (Tenn. Crim. App. 1993). Favorable evidence includes evidence that "provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispens[a]ble, element of the prosecution's

version of events, or challenges the credibility of a key prosecution witness." *Johnson v. State*, 38 S.W.3d 52, 56-57 (Tenn. 2001) (internal quotation marks omitted). Evidence is material under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability" is "a probability sufficient to undermine the confidence in the outcome." *Id.*

In the Defendant's motion for new trial, he asserted the following, in pertinent part:

> The State erred by failing to disclose exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). As demonstrated by the Exhibit entered in the sentencing hearing in this case,[7] Mr. Ferwanah was given $15,709.63 in compensation from the State of Tennessee. Throughout this case, and during the cross-examination through both trials, the defense raised the monetary motives of Mr. Ferwanah's testimony. Therefore, the information regarding the compensation from the State of Tennessee is exculpatory *Brady* evidence that the State should have—but did not—disclose before trial, violating [the Defendant]'s constitutional rights to Due Process, *Brady*, 373 U.S. at 87, 83 S. Ct. at 1196-97 ([stating that] "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"), as well as his constitutional right to cross-examine effectively the witnesses against him.

At the Defendant's motion for new trial hearing, trial counsel asked the trial court to order the release of Mr. Ferwanah's claim to the Fund. The trial court found that, even if the State was in possession of Mr. Ferwanah's claim prior to trial, the State did not violate *Brady* by failing to disclose the document to the Defendant. On January 13, 2017, the trial court released Mr. Ferwanah's victim compensation fund claim to the Defendant. The trial court's order stated the following, in pertinent part:

> Upon request of the [D]efendant, the State provided to the court the State's file regarding the victim compensation claim in the above titled action. After review, the court now releases to the [D]efendant the attached claim and reward. To be clear, the court is not finding that the materials are

---

[7] The State moved Mr. Ferwanah's victim impact statement into evidence at the Defendant's sentencing hearing. The statement mentions that Mr. Ferwanah applied to the Fund for financial reimbursement of $15,709. 63.

- 36 -

exculpatory or that the State has committed a *Brady* violation. Rather, the documents are being released to assist the [D]efendant in his appellate claim.

The documents included in Mr. Ferwanah's claim show that he filed a claim for medical bills and lost wages. In Section D of the claim, "Crime Information[,]" Mr. Ferwanah listed the names and addresses of Mr. Akila and the Defendant. The form states that the Fund is required by law to notify offenders of the victim's claim. The documents show that the Division of Claims Administration approved the following payments in Mr. Ferwanah's claim:

| Payee | Type of Claim | Amount |
|-------|---------------|--------|
| Mr. Ferwanah | Economic Support | $15,002.27 |
| University Health Systems | Medical/Dental | $    635.79 |
| Mr. Ferwanah | Medical/Dental | $    311.52 |
| Mr. Ferwanah | Medical/Dental | $    264.22 |
| Rural Metro of Midsouth LP | Medical/Dental | $    106.52 |
| Parkwest Medical Center | Medical/Dental | $    207.76 |
| Mr. Ferwanah | Medical/Dental | $    131.62 |

Here, we agree with the trial court that Mr. Ferwanah's claim to the Fund was not material. It is not reasonably probable that, had the State disclosed Mr. Ferwanah's claim prior to trial, the results of the Defendant's trial would have been different. *See Bagley*, 473 U.S. at 682. Cross-examining Mr. Ferwanah about this claim would have emphasized how severely Mr. Ferwanah was injured by the Defendant's actions. Additionally, while the Defendant could have used the claim to further his theory that Mr. Ferwanah was financially motivated to pursue action against the Defendant, the claim would have been cumulative because the Defendant was able to cross-examine Mr. Ferwanah about his civil suit against the Defendant. Additionally, we note that the Defendant failed to include in the record any motion filed that requested that the State disclose *Brady* material.[8] Thus, because the evidence is not clearly exculpatory and the Defendant did not request it, the State did not violate *Brady* by failing to disclose Mr. Ferwanah's claim to the Defendant. *See Jonathan Tears v. State*, No. M2012-01080-CCA-R3-PC, 2013 WL 6405734, at *30-31 (Tenn. Crim. App. Dec. 6, 2013) (determining that the victim's claim to the Fund was not material), *no perm. app. filed*. The Defendant is not entitled to relief on this ground.

---

[8] The only mention of a discovery request in the record is the "Defendant's oral motion for specific discovery of 911 tape of call made at 9:30 p.m." from a motion hearing. "It is the duty of the party seeking review of the action of the trial court to prepare a record sufficient to enable the reviewing court to determine if the discretion has been abused." *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983).

### Sufficiency of the evidence

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

### Count one - aggravated kidnapping with deadly weapon

The Defendant argues that "the *White* factors indicate that this event, if any crime, was an [a]ggravated [a]ssault and not any kidnapping offense, as demonstrated by the fact that the jury also convicted [the Defendant] of Aggravated Assault." The Defendant asserts that his convictions in counts one and two should be vacated "[b]ecause there was no removal or confinement above that necessary for an [a]ggravated [a]ssault[.]" The Defendant also argues that the State failed to establish that the Defendant used a deadly weapon during the offenses. The State contends that the Defendant instructed Mr. Desouzaneti to restrain Mr. Ferwanah with zip ties, making the Defendant criminally responsible for the act. The State also notes that the Defendant tricked Mr. Ferwanah into coming into Electronics Tech and sitting in a chair. The Defendant then restrained Mr. Ferwanah and continued to confine Mr. Ferwanah.

As pertinent to the Defendant's conviction in count one, "[a]ggravated kidnapping is false imprisonment[] . . . committed . . . [w]hile the defendant is in possession of a deadly weapon or threatens the use of a deadly weapon." Tenn. Code Ann. § 39-13-304(a)(5) (2012). The Tennessee Code Annotated defines "deadly weapon" as "[a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting

death or serious bodily injury[,]" or "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury[.]" Tenn. Code Ann. § 39-11-106(a)(5)(A)-(B) (2012). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a) (2012).

In *State v. White*, our supreme court set out the following list of non-exclusive factors to consider in determining whether the State proved that the defendant's removal or confinement of a victim "was to a greater degree than that necessary to commit the offense of [aggravated assault:]" (1) "the nature and duration of the victim's removal or confinement by the defendant"; (2) "whether the removal or confinement occurred during the commission of the separate offense"; (3) "whether the interference with the victim's liberty was inherent in the nature of the separate offense"; (4) "whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so"; (5) "whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective"; and (6) "whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense." 362 S.W.3d 559, 580-81 (Tenn. 2012).

Here, the record reflects that the trial court gave the *White* instruction to the jury on counts one and two. When the evidence is viewed in the light most favorable to the State, we conclude that there was sufficient evidence for a rational juror to have found the Defendant guilty of aggravated kidnapping in count one. The Defendant's actions of tying Mr. Ferwanah to the chair and removing him to the basement were beyond that which was necessary to effectuate the Defendant's assault of Mr. Ferwanah. *See State v. Jeffrey W. Tittle*, No. M2016-02006-CCA-R3-CD, 2017 WL 4773427, at *11 (Tenn. Crim. App. Oct. 23, 2017) (concluding "that the attempted aggravated kidnapping involved a separate attempted removal or confinement when the [d]efendant dragged the victim down the driveway"), *no perm. app. filed*. Further, the Defendant's restraint of Mr. Ferwanah and removal to the garage prevented Mr. Ferwanah from summoning assistance and reduced the Defendant's risk of detection. *See White*, 362 S.W.3d at 580-81. Mr. Ferwanah could not use his cellular phone or any phone in the building to call for help or medical assistance because his hands were tied.[9] Additionally, the Defendant's restraint and removal of Mr. Ferwanah increased Mr. Ferwanah's risk of harm independent of the risk of harm posed by the Defendant's aggravated assault because Mr. Ferwanah could not defend the Defendant's assault while his hands were

---

[9] We acknowledge that the proof evidenced at trial reflects that Mr. Desouzaneti tied Mr. Ferwanah's hands with zip ties. However, the jury could have found the Defendant guilty for this action under a theory of criminal responsibility. The record reflects that the trial court instructed the jury on criminal responsibility as to all four counts.

tied. We conclude that the Defendant's actions of restraining and removing Mr. Ferwanah were not essentially incidental to the Defendant's aggravated assault of Mr. Ferwanah.

Regarding the Defendant's argument that the State failed to prove that the Defendant used a deadly weapon during the offenses, Mr. Ferwanah stated that the Defendant had a gun and a knife on a table during the offenses. The Defendant opened and closed the gun to show Mr. Ferwanah that it was loaded and pointed it at Mr. Ferwanah's head. Mr. Akila testified that the Defendant told Mr. Akila to go to the office and retrieve the Defendant's gun. When Mr. Akila brought the gun to the garage, the Defendant pointed it at Mr. Ferwanah's head. Further, Mr. Ferwanah testified that the Defendant hit Mr. Ferwanah with a baseball bat and that the masked man hit Mr. Ferwanah with a "two-by-four." It was within the province of the jury's role as factfinder to credit Mr. Ferwanah's and Mr. Akila's testimony that the Defendant used a deadly weapon during the aggravated kidnapping. The Defendant is not entitled to relief on this ground.

*Count two - especially aggravated kidnapping with serious bodily injury*

Regarding count two, the Defendant argues that "there is no proof that Mr. Ferwanah sustained a serious bodily injury because the State declined to put on any testimony from any medical professionals." As noted above, the Defendant also argues that the State failed to establish that Mr. Ferwanah was removed or confined to a degree beyond that necessary to accomplish aggravated assault.

As pertinent to the Defendant's conviction in count two, "[e]specially aggravated kidnapping is false imprisonment[] . . . [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-305(a)(4) (2012). The statutory definition of false imprisonment is set out above. Serious bodily injury is a bodily injury that involves "[a] substantial risk of death[,]" "[p]rotracted unconsciousness[,]" "[e]xtreme physical pain[,]" "[p]rotracted or obvious disfigurement[,]" or "[p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(34)(A)-(E) (2012).

We have previously concluded that the Defendant's actions of restraining and removing Mr. Ferwanah were not essentially incidental to the Defendant's aggravated assault of Mr. Ferwanah. Regarding the Defendant's argument on serious bodily injury, the record reflects that Mr. Ferwanah sustained fractures in his left ankle and both wrists and bruising and lacerations on various places on his body. He also sustained an injury to his head. Mr. Ferwanah testified that his pain level after the offenses was ten out of ten, and his pain did not lessen until he was given morphine at the hospital. He stated that he

could not return to work for four and a half months. At the time of trial, Mr. Ferwanah still had pain in his right shoulder, and he occasionally "mixed up" words due to his head injury. This court has previously stated that "the subjective nature of pain is a question of fact to be determined by the trier of fact[.]" *State v. Eric A. Dedmon*, No. M2005-00762-CCA-R3-CD, 2006 WL 448653, at *5 (Tenn. Crim. App. Feb. 23, 2006), *no perm. app. filed*. Here, it was within the province of the jury's role as factfinder to credit Mr. Ferwanah's testimony that his pain level was ten out of ten. We conclude that Mr. Ferwanah's testimony was sufficient to establish that he sustained a serious bodily injury during the kidnapping. *See State v. Dewayne Jones*, No. W2016-00074-CCA-R3-CD, 2017 WL 2998900, at *7 (Tenn. Crim. App. July 14, 2017) (concluding that the evidence was sufficient to establish aggravated assault based on the victim's testimony that his pain level was ten out of ten), *perm. app. denied* (Tenn. Oct. 6, 2017). The Defendant is not entitled to relief on this ground.

### *Count three - aggravated assault with serious bodily injury*

As noted above, the Defendant argues that the State failed to present any proof that Mr. Ferwanah sustained a serious bodily injury because no medical professionals testified at trial.

As applicable to count three, a person commits aggravated assault who "[i]ntentionally or knowingly commits an assault . . . and[] [c]auses serious bodily injury to another[.]" Tenn. Code Ann. § 39-13-102(a)(1)(A)(i) (2012). Serious bodily injury is defined above. A defendant commits assault when he "[i]ntentionally, knowingly or recklessly causes bodily injury to another[,]" "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury[,]" or "[i]ntentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative." Tenn. Code Ann. § 39-13-101(a) (2012).

We have previously concluded that it was within the province of the jury's role as factfinder to credit Mr. Ferwanah's testimony that his pain level after the offenses was ten out of ten. We conclude that, when the evidence is viewed in the light most favorable to the State, a rational juror could have found beyond a reasonable doubt that the Defendant intentionally or knowingly caused Mr. Ferwanah to sustain a serious bodily injury. The Defendant is not entitled to relief on this ground.

### *Count four - aggravated assault with a deadly weapon*

As noted above, the Defendant argues that the State failed to establish that the Defendant used a deadly weapon during the offenses.

As relevant to count four, a person commits aggravated assault who "[i]ntentionally or knowingly commits an assault . . . and[] uses or displays a deadly weapon[.]" Tenn. Code Ann. § 39-13-102(a)(1)(A)(ii) (2012). "Deadly weapon" and assault are defined above. We have previously stated that it was within the province of the jury's role as factfinder to credit Mr. Ferwanah's and Mr. Akila's testimony that the Defendant used a gun, a deadly weapon, during the offenses. We conclude that the evidence introduced at trial was sufficient for a rational juror to have found that the Defendant intentionally or knowingly caused Mr. Ferwanah to sustain and fear bodily injury while using and displaying a deadly weapon.

*Sentencing*

The Defendant argues that the trial court erred in finding that the Defendant possessed or employed a firearm or a deadly weapon during the offenses against Mr. Ferwanah because the State charged the Defendant with two counts of aggravated assault on alternative theories, one of which was that the assault was committed with a deadly weapon. Thus, the Defendant contends that the enhancement factor was subsumed as an element of the offense in count four. Additionally, the Defendant argues that the trial court erred in finding that the Defendant treated, or allowed Mr. Ferwanah to be treated, with exceptional cruelty during the commission of the offenses because the factor was subsumed in the elements of especially aggravated kidnapping and aggravated kidnapping. The State argues that "[t]he trial court . . . properly treated [the Defendant]'s convictions as separate when determining which enhancement factors applied."

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing determination." *Bise*, 380 S.W.3d at 709. Moreover, under those circumstances, this court may not disturb the sentence even if it had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008).

In determining the proper sentence, the trial court must consider:  (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing.  *See* Tenn. Code Ann. § 40-35-210(b)(1)-(7) (2016); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).  The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed.  Tenn. Code Ann. § 40-35-103(5) (2016).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen.  Tenn. Code Ann. § 40-35-210(e) (2016); *Bise*, 380 S.W.3d at 706.  However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]."  *Bise*, 380 S.W.3d at 705-06.  The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper.  Tenn. Code Ann. § 40-35-401 (2016), Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2016).

Although the trial court should also consider enhancement and mitigating factors, such factors are advisory only.  *See* Tenn. Code Ann. § 40-35-114 (2016); *see also Bise*, 380 S.W.3d at 698, 704; *Carter*, 254 S.W.3d at 346.  We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion."  *Carter*, 254 S.W.3d at 345.  In other words, "the trial court is free to select

any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346. "By statute, an enhancement factor must be appropriate for the offense and not an essential element of the offense." *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002) (citing Tenn. Code Ann. § 40-35-114 (1997 & Supp. 2001)).

The trial court found that the Defendant was a leader in the commission of an offense that involved two or more actors because the Defendant organized the offenses and directed Mr. Akila and Mr. Desouzaneti. *See* Tenn. Code Ann. § 40-35-114(2) (2016). The trial court gave this factor "a significant deal of weight[.]" The trial court also found that the Defendant treated or allowed Mr. Ferwanah to be treated with exceptional cruelty during the commission of the offenses. *See* Tenn. Code Ann. § 40-35-114(5) (2016). However, the trial court did not give this enhancement factor much weight. The trial court found that the Defendant possessed or employed a firearm or other deadly weapon during the commission of the offenses. *See* Tenn. Code Ann. § 40-35-114(9) (2016). The trial court only applied this enhancement factor to counts two and three and gave the factor "some weight."

Here, the trial court ordered the Defendant to serve sentences within the proper range for a Range I standard offender. The Defendant received a sentence of twelve years for his conviction in count one, aggravated kidnapping, which is a Class B felony. *See* Tenn. Code Ann. § 39-13-304(b)(1) (2012); § 40-35-112(a)(2) (2016) (a Range I sentence for a Class B felony is eight to twelve years). The Defendant received a sentence of seventeen years for his conviction of especially aggravated kidnapping, a Class A felony, in count two. *See* Tenn. Code Ann. § 39-13-305(b)(1) (2012); § 40-35-112(a)(1) (2016) (a Range I sentence for a Class A felony is fifteen to twenty-five years). The Defendant received sentences of six years for each of his convictions of aggravated assault, a Class C felony, in counts three and four. *See* Tenn. Code Ann. § 39-13-102(e)(1) (2012); § 40-35-112(a)(3) (2016) (A Range I sentence for a Class C felony is three to six years). Because the trial court gave the Defendant an in-range sentence, the trial court's decision is afforded a presumption of reasonableness, and we will not reverse absent an abuse of discretion.

*Exceptional cruelty enhancement factor*

The exceptional cruelty enhancement factor is usually applied "in cases of abuse or torture." *State v. Williams*, 920 S.W.2d 247, 259 (Tenn. Crim. App. 1995) (citing *State v. Davis*, 825 S.W.2d 109, 113 (Tenn. 1991); *State v. Haynes*, 720 S.W.2d 76, 86 (Tenn. Crim. App. 1986)). Our supreme court has stated that this enhancement factor "denotes the infliction of pain or suffering for its own sake or from the gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged" and "requires more than the physical infliction of serious bodily injury upon a victim." *Reid*, 91 S.W.3d at 311. In order for this factor to properly apply, "the facts must demonstrate a culpability distinct from and greater than that incident to the offense." *Id.* (citing *State v. Poole*, 945 S.W.2d 93, 98 (Tenn. 1997)). In *Reid*, our supreme court noted that exceptional cruelty was not an element of the offense of especially aggravated robbery and that "proof of serious bodily injury, which is an element of especially aggravated robbery, does not necessarily establish the enhancement factor of 'exceptional cruelty.'" *Id.*

Initially, we note that "exceptional cruelty" is not an element of aggravated kidnapping, especially aggravated kidnapping, or aggravated assault. *See* Tenn. Code Ann. § 39-13-304(a)(5) (2012); § 39-13-305(a)(4) (2012); § 39-13-102(a)(1) (2012). We conclude that the trial court properly found that the Defendant treated or caused Mr. Ferwanah to be treated with exceptional cruelty during the offenses. The trial court noted that Mr. Ferwanah felt terrified and helpless during the offenses and believed that he was going to die. The trial court stated that Mr. Ferwanah's kidnapping was "one of the worst" that the trial court had seen. The Defendant tricked Mr. Ferwanah into coming into Electronics Tech, sitting down, and being tied up. The Defendant then beat and threatened Mr. Ferwanah with various weapons while demanding that Mr. Ferwanah confess to having an affair with the Defendant's wife. The Defendant also inferred that he had already killed the Defendant's wife and would kill Mr. Ferwanah and dispose of his body. We agree with the trial court that the circumstances of these offenses show that the Defendant acted with exceptional cruelty. The Defendant is not entitled to relief on this ground.

*Firearm or deadly weapon enhancement factor*

When a defendant is convicted on multiple counts of the same offense that are based on alternative theories, the counts based on serious bodily injury may be enhanced by the use or possession of a deadly weapon. *See State v. Carter*, 986 S.W.2d 596, 598 (Tenn. Crim. App. 1998) ("[T]he use of a deadly weapon is not an essential element of an aggravated assault causing serious bodily injury and can be an enhancement factor."). We conclude that the trial court did not abuse its discretion in its application of the

firearm or deadly weapon enhancement factor to the Defendant's sentence. Here, the trial court specifically did not apply the firearm or deadly weapon enhancement factor to count four, aggravated assault based on the use or possession of a deadly weapon. Thus, the enhancement factor was not included as an element of the offense, and the trial court properly applied this enhancement factor.

### *Purposes and principles of the Sentencing Act*

Additionally, the Defendant contends that his sentence does not abide by the principles and purposes of the Sentencing Act. As noted above, we afford the trial court's sentencing decision a presumption of reasonableness because the trial court ordered sentences within the statutory range. We conclude that the trial court properly considered the purposes and principles of the Sentencing Act. The evidence supports the trial court's decision to order the maximum sentence for the Defendant's convictions of aggravated kidnapping in count one and aggravated assault in counts three and four. The Defendant tricked his friend, Mr. Ferwanah, into entering Electronics Tech, sitting in a chair, and being restrained. The Defendant then spent several hours beating and threatening Mr. Ferwanah with various weapons and directing Mr. Akila to film the offenses. The Defendant also directed Mr. Desouzaneti's involvement in the offenses. The Defendant threatened to kill Mr. Ferwanah and dispose of his body if he did not confess to having an affair with the Defendant's wife. Mr. Ferwanah sustained bruising, lacerations, and broken bones from the offenses. Mr. Ferwanah and his family also sustained serious emotional injury from the offenses and received counseling. The trial court ordered the Defendant to serve a sentence near the bottom of the range for his conviction of especially aggravated kidnapping, a Class A felony, in count two and ordered the Defendant's sentences to be served concurrently with each other for a total effective sentence of seventeen years in TDOC. We conclude the trial court did not abuse its discretion in its sentencing of the Defendant. The Defendant is not entitled to relief on this ground.

### **Cumulative Error**

The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation, but "have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To warrant review under the cumulative error doctrine, there must have been more than one actual error during the trial proceedings. *Id.* at 77. We have found no errors in this case. Thus, the Defendant is not entitled to cumulative error relief.

### III. Conclusion

Based on the aforementioned reasons, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE